O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRO SEARCH PLUS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>VFM LEONARDO, INC., etc.,<br><br>Defendant. | CASE NO. SACV 12-2102-JST (ANx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |

This is an antitrust action involving the market for the management and distribution of digital images and so-called "rich media" content for hotel and travel-related websites. Presently before the Court is Defendant VFM Leonardo, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint. (Mot., Doc. 37.) Plaintiff Pro Search Plus, Inc. opposed, and VFM Leonardo replied. (Opp'n, Doc. 47; Reply, Doc. 48). Having reviewed the papers and considered the arguments of counsel at the hearing, the Court GRANTS IN PART and DENIES IN PART the Motion.

## I. Background

When ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010). Pro Search and VFM Leonardo ("VFML") compete in the market for management and distribution of photographs and rich media content for hotels. (*See* First Am. Compl. ("FAC") ¶¶ 1, 8-9.) Any hotel that wants to advertise or distribute visual and rich content through an online travel agency must use an intermediary such as a Global Distribution System (known in the industry as a "GDS") or Pegasus. (*Id.* ¶¶ 2, 17.) Pegasus is the industry's sole content and information aggregator. (*Id.* ¶ 2.) Pro Search alleges that VFML has engaged in illegal, anticompetitive behavior by: (1) entering into exclusive dealing agreements with all four GDSs[1]; (2) entering into an exclusive dealing agreement with Pegasus, which works with the GDSs; and (3) entering into exclusive dealing agreements with hotels. (*See id.*) VFML's contracts with the GDSs and Pegasus constitute the "core of VFML's monopoly power." (*Id.* ¶ 19.)

VFML has allegedly engaged in this conduct with the intent to "eliminate" Pro Search "as a viable a competitor and threat to VFML's online hotel listings distribution business," and to reduce competition generally. (*Id.* ¶ 69.)

---

[1] The four GDSs are Sabre/Travelocity, Worldspan, Galileo, and Amadeus. (*See id.* ¶ 2.)

2

As a result, Pro Search has been excluded from accessing the GDSs and Pegasus, which are essential intermediaries in the industry, and VFML has raised its prices without any fear of competition. (*See id.* ¶¶ 2-3.) Moreover, Pro Search alleges that there is "no reasonable substitute for still photos and rich media in the context of promoting hotels to travel agents or consumers online." (*Id.* ¶ 20.) Finally, Pro Search alleges that VFML has a market share of approximately 80%. (*Id.* ¶ 38.)

On the basis of these and other allegations, Pro Search asserts five claims: (1) actual monopolization in violation of Section 2 of the Sherman Act; (2) attempted monopolization in violation of Section 2 of the Sherman Act; (3) unlawful arrangements in violation of Section 1 of the Sherman Act; (4) unlawful exclusionary arrangements in violation of Section 3 of the Clayton Act; and (5) reverse "passing off" in violation of § 43(a) of the Lanham Act.

**II. Legal Standard**

When evaluating a Rule 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party. *See Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 556). A complaint must (1) "contain sufficient allegations

3

of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Moreover, the Supreme Court has cautioned against permitting antitrust cases to proceed to discovery without a plaintiff demonstrating "plausibility" because of the high cost of discovery in antitrust cases in particular. *See Twombly*, 550 U.S. at 558 ("Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." (internal citation omitted)).

In considering the motion, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

**III. Discussion**

    **A. The Sherman Act Claims**

VFML moves to dismiss Pro Search's three Sherman Act claims on the same four grounds: (1) the alleged exclusive contracts do not violate the antitrust laws; (2) Pro Search's allegations of "threats" and "force" are conclusory; (3) Pro Search has failed to adequately allege antitrust injury; and (4) Pro Search's geographic market is facially unsustainable.

4

Exclusive deals can violate the antitrust laws. "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010). Because there are "well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition," *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), exclusive dealing arrangements are analyzed under the rule of reason, *Allied Orthopedic*, 592 F.3d at 996. "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Id.* (quoting *Omega*, 127 F.3d at 1162).

VFML argues that its contracts with the four GDSs and Pegasus are not illegal and thus do not support an antitrust claim. VFML bases this contention on the assertion that its contracts with the GDSs and Pegasus are of short duration and are easily terminable. The terminability and duration of VFML's contracts with the GDSs and Pegasus are as follows:

| VFML Contract | Terminability | Duration |
|---|---|---|
| Galileo | 90 Days' Notice | 3 Years |
| Worldspan | 90 Days' Notice | 2 Years |
| Sabre | 10 Days' Notice and Termination Fee | 3 Years |
| Amadeus | 30 Days' Notice | 3 Years |
| Pegasus | 12 Months' Notice | 5 Years |

(Def.'s Mem. P. & A. ISO Mot. at 15, Doc. 37.)[2]

---

[2] Because Pro Search's First Amended Complaint relies upon the contracts, the Court grants VFML's request to take judicial notice of the contracts. *Branch*, 14 F.3d at 453-54. (*See* Doc. 40.) However, the Court cannot, and does not, consider extraneous assertions regarding the contracts, including assertions to the effect that some of the contracts have already been terminated.

5

As mentioned above, the case law generally supports the contention that exclusive contracts of short duration that are readily terminable do not run afoul of the antitrust laws. *See Omega Envtl.*, 127 F.3d at 1162; *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996); *CDC Technologies, Inc. v. IDEXX Labs, Inc.*, 186 F.3d 74, 80-81 (2d Cir. 1999); *see also* 11 Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1802g2 & n. 68 (3d ed. 2011) [hereinafter Areeda & Hovenkamp]. "Even an exclusive-dealing contract covering a dominant share of a relevant market need have no adverse consequences if the contract is let out for frequent rebidding." 11 Areeda & Hovenkamp ¶ 1802g2. Under the case law, Pro Search has not stated a claim under the Sherman Act.

In *Paddock Publication*, the Seventh Circuit affirmed dismissal of a plaintiff's antitrust complaint for failure to state a claim. 103 F.3d at 42. The plaintiff (a newspaper) complained that the two larger newspapers in its geographic market (Chicago, Illinois), "supplemental news services," and feature syndicates entered into exclusivity agreements, alleging that the cumulative effect of the agreements violated the Sherman Act. *Id.* at 43. The Seventh Circuit affirmed the dismissal, explaining that the exclusivity agreements at issue were common in the market and did not stifle competition—at least in the more significant long-run:

> Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common. Every year or two, General Motors, Ford, and Chrysler invite tire manufacturers to bid for exclusive rights to have their tires used in the manufacturers' cars. Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the longer run, and competition of this kind drives down the price of tires, to the ultimate benefit of consumers.

*Id.* at 45.

Similarly, the Sixth Circuit affirmed dismissal of an antitrust plaintiff's complaint in *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007). NicSand was a supplier of automotive sandpaper, and it challenged the defendant-supplier's multiyear exclusive-

6

1 dealing agreements with retailers. The court rejected NicSand's challenge to 3M's multi-
2 year, exclusive-dealing agreements, explaining: "From the perspective of a retailer, multi-
3 year agreements permit the retailer to insist that the supplier charge lower prices.
4 Committing to a multi-year agreement, indeed, is no different than buying in bulk." *Id.* at
5 453. The court also explained that "[f]rom the perspective of a supplier, multi-year
6 agreements ease an aspiring entrant's ability to clear existing market barriers" by allowing
7 a supplier to "recoup [an] initial investment" over several years. *Id.*

8 Finally, VFML relies upon *SPX Corp. v. Mastercool U.S.A., Inc.*, No. 3:10 CV
9 1266, 2011 WL 2532889, at *1 (N.D. Ohio June 24, 2011). In that case, the district court
10 dismissed the defendant's antitrust counterclaim for failure to state a claim based on a lack
11 of an alleged antitrust injury. At issue were the plaintiff's one-year contracts with
12 distributors, which provided for termination by either party "for any reason" upon 30 days'
13 written notice. *Id.* at *1. The Court concluded: "SPX's contracts with distributors and
14 services have a short one-year duration, and provide for termination by written notice for
15 any reason after 30 or 90 days. Such short contracts, with no-questions-asked termination
16 clauses do not approach the threshold of foreclosing competition, even in a substantial
17 share of the market, required for a private antitrust claim." *Id.* at *4.

18 The Court finds *Paddock*, *NicSand*, and *SPX* persuasive. The case law and
19 commentary are in accord that short-term contracts that are readily terminable do not
20 violate the antitrust laws. This is not to say that exclusivity agreements could never give
21 rise to an antitrust claim, of course. For example, the *NicSand* court noted, "[h]ad 3M used
22 illegal tying to obtain a multi-year agreement, that might be another matter." 507 F.3d at
23 453. Here, there are no such factual allegations that VFML obtained the exclusivity
24 agreements through nefarious means such as tying.[3]

---

[3] This is in contrast to the situation in *ICE Portal, Inc. v. VFM Leonardo, Inc.*, No. 09-61424-CIV-ALTONAGA/Brown (S.D. Fla. July 6, 2010), where the plaintiff had alleged tying. *See id.*
   (footnote continued)

7

Pro Search also alleges that VFML has "successfully threatened, intimidated, deceived, and/or coerced actual and potential purchasers" of Pro Search's products to not deal with Pro Search.  (*See, e.g.*, FAC ¶ 43(b); *see also id.* ¶ 35 ("VFM has used its monopoly power in the distribution market to force most major hotels and hotel groups to agree to use VFML").)  However, those allegations are patent legal conclusions that are not entitled to a presumption of truth and do not support Pro Search's claims.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (holding that Rule 8 demands more than "an unadorned, the defendant-unlawfully-harmed-me accusation").  Moreover, while the case law does support the general proposition that a *de facto* exclusive dealing arrangement can run afoul of the antitrust laws, Pro Search has not alleged anything beyond the existence of the contracts to support its apparently broader "*de facto* arrangement" theory.[4]

As it stands now, Pro Search's Sherman Act claims are predicated only upon VFML's exclusivity agreements with the GDSs and Pegasus.  Because those contracts are of relatively short duration and, crucially, can be terminated upon short notice, they do not—by themselves—sustain the Sherman Act claims.  *See* 11 Areeda & Hovenkamp ¶ 1802g ("Short contract terms and low switching costs generally allay most fears of injury to competition.")  As the *NicSand* court noted, quoting the Supreme Court: "It is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition, because "[t]he antitrust laws . . . were enacted for the protection of *competition* not *competitors*."  *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450-51 (6th Cir. 2007) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (alteration omitted)).  As alleged, because the contracts at issue can be terminated upon short notice, the GDSs and

---

at *6.  Pro Search attached a copy of the *ICE Portal* court's order to its Opposition.  (*See* Opp'n Ex. A, Doc. 34.)

[4] *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), referenced by Pro Search in its papers and at oral argument, does not support Pro Search's Sherman Act claims.  The *Tampa Electric* Court reversed a summary judgment, concluding that a twenty-year requirements contract between a public utility and a coal supplier did not violate § 3 of the Clayton Act.

1 Pegasus will be able to switch quickly to Pro Search's services if they prefer those services
2 or the terms upon which Pro Search offers its services. *Cf. Paddock Publications*, 103
3 F.3d at 47 ("[S]omeone with a better offer can get or sell news on short notice. The
4 *Herald* has never tried to make a better offer, and we conclude that it has come to the
5 wrong forum."). In this way, the short exclusivity agreements can *promote* competition.
6 *See Omega Envtl.*, 127 F.3d at 1162. *Cf.* 2 Areeda & Hovenkamp ¶ 348c ("A temporary
7 purchase commitment that overcomes an entry barrier increases rather than reduces
8 competition.").

9 At the hearing, Pro Search conceded that, in support of its Sherman Act claims, it
10 had alleged only the existence of the exclusivity agreements and VFML's market power,
11 and that it needed discovery to find the "something more," such as *de facto* exclusive
12 dealing. As the Seventh Circuit noted in a passage the *Twombly* Court later echoed, "the
13 costs of modern federal antitrust litigation and the increasing caseload of the federal courts
14 counsel against sending the parties into discovery when there is no reasonable likelihood
15 that the plaintiffs can construct a claim from the events related in the complaint." *Car*
16 *Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984). Those words are
17 just as applicable here, nearly 30 years later, in the case at bar.

18 This claim is dismissed without prejudice.

19 **B. Clayton Act Section 3 Claim**

20 VFML moves to dismiss Pro Search's Clayton Act Section 3 claim on the ground
21 that Section 3 applies only to contracts for tangible goods and is therefore inapplicable to
22 the services Pro Search provides. Section 3 provides in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of
> such commerce, to lease or make a sale or contract for sale of goods, wares,
> merchandise, machinery, supplies, or other commodities, . . . or fix a price
> charged therefor, or discount from, or rebate upon, such price, on the
> condition, agreement, or understanding that the lessee or purchaser thereof
> shall not use or deal in the goods, wares, merchandise, machinery, supplies,
> or other commodities of a competitor or competitors of the lessor or seller,
> where the effect of such lease, sale, or contract for sale or such condition,

9

agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

By its plain language, § 3 applies only to agreements for tangible goods or commodities. *See Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1145 (2d Cir. 1975) ("It is, of course, well settled that section 3 does not apply to sales of services."). Pro Search's Opposition omits discussion of this contention, *see* C.D. Cal. R. 7-9, and, indeed, Pro Search acknowledged at the hearing that it has abandoned this claim.

This claim is dismissed with prejudice.

**C. Lanham Act Claim**

Pro Search's fifth claim is for "reverse passing-off" (sometimes called "reverse palming-off") in violation of § 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a). "Passing off" is "the practice of selling one person's product or service under the name or mark of another. Passing off may be either 'express' or 'implied.'" *Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1406 (9th Cir. 1988) (citations omitted). "Express passing off occurs when a business labels its goods or services with a mark identical to that of another enterprise, or otherwise expressly misrepresents the origin of the goods or services. Implied passing off involves the use of a competitor's advertising material, or a sample or photograph of the competitor's product, to impliedly represent that the product being sold is made by the competitor." *Id.* (citations omitted).

Section 43(a) also proscribes "reverse passing-off." *See id.* "Express reverse passing off is accomplished . . . when the wrongdoer removes the name or trademark on another party's product and sells that product under a name chosen by the wrongdoer. Implied reverse passing off is accomplished simply by removing or obliterating the name of the source and then selling the product in an unbranded state." *Id.* (omission in original) (citations omitted).

Pro Search alleges that all four GDSs and Pegasus "source hotel visual content through VScape." (FAC ¶ 97.). VScape is VFML's "multimedia online viewer," which is part of its "digital asset management system." (*Id.*) Pro Search further alleges that VFML has "misappropriated hotel photo images and rich media" Pro Search has created and has displayed such content on the websites of various hotels and online travel agents with VFML's "VPowered" logo featured at the bottom of such content, or with the "false and misleading designation . . . : 'Hotel images provided by VFM Leonardo Inc.'" (FAC ¶ 100-100(k).) VFML has thereby allegedly misrepresented the origin of such content and deceived the public. (FAC ¶ 100.)

VFML argues that the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), forecloses Pro Search's claim for reverse passing-off. *Dastar* arose out of a television series the plaintiffs had produced based on General (and future president) Dwight D. Eisenhower's World War II memoir, *Crusade in Europe*. The copyright owner of the book licensed the television rights to an affiliate of plaintiff Twentieth Century Fox. The television series was first broadcast in 1949. Ultimately, the book's publisher renewed its copyright in the book, but Fox did *not* renew its copyright in the television series.

Dastar subsequently made a video series that featured many clips from the television series, which was then in the public domain due to the expiration of Fox's copyright. It was not a wholesale copy of the series, however.[5] Fox then licensed to New Line Home Video, Inc., the rights to distribute the *Crusade* video series.

New Line and Fox then brought suit against Dastar alleging, *inter alia*, a reverse passing-off claim under § 43(a) of the Lanham Act, based on the fact that the Dastar video

---

[5] "Dastar substituted a new opening sequence, credit page, and final closing for those of the Crusade television series; inserted new chapter-title sequences and narrated chapter introductions; moved the "recap" in the Crusade television series to the beginning and retitled it as a "preview"; and removed references to and images of the book. Dastar created new packaging for its Campaigns series and (as already noted) a new title." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 26-27 (2003).

series did not properly attribute the excerpts taken from the Fox television series. The district court entered summary judgment for the plaintiffs on the Lanham Act claim, and the Ninth Circuit affirmed in relevant part. *Dastar*, 539 U.S. at 28.

The Supreme Court reversed. The Court's central holding pertained to the meaning of "origin of goods" within the Lanham Act: "In sum, reading the phrase 'origin of goods' in the Lanham Act . . . we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. Therefore, the Court concluded that Fox ("the author of any idea . . . embodied" in Dastar's video series) could not assert a Lanham Act claim against Dastar based on Dastar's unattributed use of excerpts from Fox's *Crusade* series.

The *Dastar* Court explained that to read § 43(a) as authorizing a claim for failure to provide attribution would "create a species of mutant copyright law," *id.* at 34, and that "[t]o hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do," *id.* at 37.

The *Dastar* Court recognized an exception to the rule it announced:

> Thus, as it comes to us, the gravamen of respondents' claim is that, in marketing and selling Campaigns as its own product without acknowledging its nearly wholesale reliance on the Crusade television series, Dastar has made a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the origin . . . of his or her goods." § 43(a). That claim would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own. Dastar's alleged wrongdoing, however, is vastly different: It took a creative work in the public domain—the Crusade television series—copied it, made modifications (arguably minor), and produced its very own series of videotapes. If "origin" refers only to the manufacturer or producer of the physical "goods" that are made available to the public (in this case the videotapes), Dastar was the origin. If, however, "origin" includes the creator of the underlying work that Dastar copied, then someone else (perhaps Fox) was the origin of Dastar's product.

*Dastar*, 539 U.S. at 31 (docket citation omitted).

McCarthy explains the distinction the Court drew in its construction of the word "origin":

> For example, "origin" means the printer or publisher of a book, not the author of the literary content in that book. "Origin" means the factory that manufactures an auto engine, not the inventor of the patented components in that engine. [¶] This means, for example, that if someone falsely takes credit for being the "author" of a literary work such as a book, song or television series, that false statement of fact cannot be a violation of Lanham Act § 43(a)(1)(A). That false statement of authorship relates to creation of the communicative content of the goods, not to the physical embodiment of the tangible product. That, said the Court, is not what "origin" means in § 43(a)(1)(A). That statement about authorship is false, but it is not a violation of Lanham Act § 43(a)(1)(A).

5 McCarthy on Trademarks and Unfair Competition § 27:78 (4th ed. 2013).

Based upon the allegations in the First Amended Complaint, it is unclear whether Pro Search is more like the "printer [/] publisher" or the "author" (in McCarthy's language) of the digital images and rich media it distributes. Thus, dismissal on the basis of *Dastar* is inappropriate at this early stage in the litigation. Pro Search's allegations and its role with respect to the digital images and rich media will be explored in discovery, and VFML's argument that *Dastar* precludes Pro Search's Lanham Act claim is more appropriately addressed at a later stage in this case.

**IV. Conclusion**

For the foregoing reasons, the Motion is GRANTED IN PART and DENIED IN PART. Pro Search's Sherman Act and Lanham Act claims are dismissed without prejudice. Pro Search's Clayton Act claim is dismissed with prejudice.

DATED: July 30, 2013         _____
                              JOSEPHINE STATON TUCKER
                              JOSEPHINE STATON TUCKER
                              UNITED STATES DISTRICT JUDGE