BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
mblecher@blechercollins.com
Donald R. Pepperman (State Bar No. 109809)
dpepperman@blechercollins.com
Gary M. Joye (State Bar No. 117440)
gjoye@blechercollins.com
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiff
Pro Search Plus, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| PRO SEARCH PLUS, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>VFM LEONARDO, INC., a Canadian corporation,<br><br>Defendant. | Case No. SACV12-02102-JLS (ANx)<br><br>**PLAINTIFF PRO SEARCH PLUS, LLC'S OPPOSITION TO DEFENDANT VFM LEONARDO, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Hon. Josephine L. Staton<br><br>Date:     November 22, 2013<br>Time:     2:30 PM<br>Ctrm.:    Courtroom 10A |

Blecher Collins
Pepperman & Joye

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF FACTS ................................................... 1

ARGUMENT ................................................................................................. 4

I.    Legal Standard ............................................................................... 4

II.    PSP Has Sufficiently Pled Sherman Act Claims ................................. 4

    A.    PSP Has Sufficiently Pled Unlawful Monopoly Maintenance Through Exclusionary Conduct Eliminating Competition .................................................................. 5

        1.    Monopoly-Maintenance Standard ................................... 5

        2.    VFML's Monopoly-Maintenance Conduct ....................... 7

            a.    VFML's Exclusive Dealing Contracts are Neither of Short Duration, Nor Easily Terminable, But Are *De Facto* Perpetual Exclusive Dealing Arrangements Foreclosing Competition That Have Never Been Terminated ...................................................... 8

            b.    *De Facto* Exclusivity Exists Because Dealing with VFML Is an Economic Necessity and Switching Costs Are Prohibitive ........................... 13

            c.    VFML's *De Facto* Exclusive Dealings Foreclose Competition and Constitute Unlawful Monopoly Maintenance ....................... 16

    B.    PSP Has Sufficiently Pled Tying Claims ................................. 22

    C.    PSP Has Sufficiently Pled Antitrust Injury .............................. 22

    D.    PSP Has Pled a Plausible Relevant Geographic Market ........... 23

III.    This Court Has Already Ruled That Dismissal of PSP's Lanham Act Claim is Inappropriate at This Stage ........................................... 24

IV.    PSP Has Sufficiently Pled Intentional Interference Claims ................ 24

V.    PSP Withdraws Its Copyright Infringement Claim Without Prejudice ....................................................................................... 25

CONCLUSION .............................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Blecher Collins
Pepperman & Joye

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

<u>Cases</u>

4

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
  592 F.3d 991 (9th Cir. 2010) ............................................................... 11

5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) ............................................................... 5

6

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................... 4

7

*City of Anaheim v. S. Cal. Edison Co.,*
  955 F.2d 1373 (9th Cir. 1992) ............................................................... 6

8

*Cosmetic Ideas v. IAC/Interactive Corp.,*
  606 F.3d 612 (9th Cir. 2010) ............................................................... 25

9

*Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.,*
  99 F.3d 937 (9th Cir. 1996) ............................................................... 4

10

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23 (2003) ............................................................... 24

11

*Datel Holdings Ltd. v. Microsoft Corp.,*
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ............................................................... 23

12

*DocMagic, Inc. v. Ellie Mae, Inc.,*
  745 F. Supp. 2d 1119 (N.D. Cal. 2010) ............................................................... 23

13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
  637 F.3d 435 (4th Cir. 2011) ............................................................... 23

14

*E.W. French & Sons, Inc. v. Gen. Portland Inc.,*
  885 F.2d 1392 (9th Cir. 1989) ............................................................... 22

15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) ............................................................... 5

16

*Erickson v. Pardus,*
  551 U.S. 89 (2007) ............................................................... 4

17

*Gilligan v. Jamco Dev. Corp.,*
  108 F.3d 246 (9th Cir. 1997) ............................................................... 4

18

*Gilstrap v. United Air Lines, Inc.,*
  709 F.3d 995 (9th Cir. 2013) ............................................................... 4

19

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) ............................................................... 4

20

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.,*
  No. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) ............................................................... 8

21

*Korea Supply Co. v. Lockheed Martin Corp.,*
  29 Cal. 4th 1134 (2003) ............................................................... 24

22

*LePage's, Inc. v. 3M,*
  324 F.3d 141 (3d Cir. 2003) ............................................................... 6, 7, 13

23

*Masimo Corp. v. Tyco Health Care Group, L.P.,*
  350 Fed. Appx. 95 (9th Cir. 2009) ............................................................... 1, 13

24

*Masimo Corp. v. Tyco Health Care Group, L.P.,*
  No. 02-4770, 2004 WL 5907538 (C.D. Cal. June 10, 2004) ............................................................... 6, 8

25

*Masimo Corp. v. Tyco Health Care Group, L.P.,*
  No. 02-7440, 2006 WL 1236666 (C.D. Cal. Mar. 22, 2006) ............................................................... 13, 19

26

*Morongo Band of Mission Indians v. Rose,*
  893 F.2d 1074 (9th Cir. 1990) ............................................................... 25

27

*Movie 1 & 2 v. United Artists Commc'ns, Inc.,*
  909 F.2d 1245 (9th Cir. 1990) ............................................................... 5

28

Blecher Collins
Pepperman & Joye

*Newcal Indus., Inc. v. IKON Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................... 23
*NicSand, Inc. v. 3M Co.*,
   507 F.3d 442 (6th Cir. 2007) ........................................................... 10, 11
*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) .................................................. 10, 11, 12
*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) ................................................................... 10
*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................ 22
*SPX Corp. v. Mastercool U.S.A., Inc.*,
   No. 10-1266, 2011 WL 2532889 (N.D. Ohio June 24, 2011) ........ 10, 11
*Standard Fashion Co. v. Magrane-Houston Co.*,
   258 U.S. 346 (1922) .............................................................................. 17
*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ........................................................................ passim
*Tele Atlas N.V. v. Navteq Corp.*,
   No. 05-01673, 2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ............ 6, 7
*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ................................................................. 23
*U.S. v. Dentsply Int'l Inc.*,
   399 F.3d 181 (3d Cir. 2005) ............................................................ passim
*U.S. v. Grinnell Corp.*,
   384 U.S. 563 (1966) ................................................................................ 7
*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................... 6, 7
*United Shoe Mach. Corp. v. U.S.*,
   258 U.S. 451 (1922) .............................................................................. 17
*W. Parcel Express v. United Parcel Serv.*,
   65 F. Supp. 2d 1052 (N.D. Cal. 1998), ............................................... 10
*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
   190 F.3d 974 (9th Cir. 1999) .......................................................... 10, 11
*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012), ......................................................... passim

Statutes

15 U.S.C. § 1 ............................................................................................ 5, 6
15 U.S.C. § 2 ....................................................................................... passim

Rules

Fed. R. Civ. P. 8 ........................................................................................... 4
Fed. R. Civ. P. 12 .................................................................................... 4, 21
Local Rule 7-18 .......................................................................................... 24

**INTRODUCTION AND SUMMARY OF FACTS**

Plaintiff Pro Search Plus, LLC ("PSP") submits this Memorandum in opposition to Defendant VFM Leonardo, Inc.'s ("VFML") Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC"). Dkt. 64.

This lawsuit centers around VFML's deliberate and continuing monopolization of the relevant markets for the management and distribution of hotel digital photographs and rich media for online hotel listings distribution, in violation of Sections 1 and 2 of the Sherman Act. SAC ¶¶ 1-2. VFML has unlawfully maintained and indefinitely perpetuates these monopolies by means of a vast, industry-wide network of *de facto* exclusive dealing arrangements, produced as a result of coerced tying arrangements. *Id.* The exclusive dealing agreements here are of the same kind condemned in cases such as *U.S. v. Dentsply Int'l Inc.*, 399 F.3d 181 (3d Cir. 2005), *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), *cert. denied* __ U.S. __, 2013 WL 673880 (Apr. 29, 2013), and *Masimo Corp. v. Tyco Health Care Group, L.P.*, 350 Fed. Appx. 95, 97 (9th Cir. 2009).

The bulk of travel arrangements for airlines and lodging are arranged electronically, and hotels are very competitive in appealing to this potential group of travelers. SAC ¶¶ 9-10. All major hotels display still photographs and videos/virtual tours (known as rich media) on websites and, more importantly, on Pegasus and electronic reservation networks known as GDSs, and all major online travel agents portals such as Expedia, Priceline, TripAdvisor, Orbitz, Kayak, and others, known as "OTAs." *Id.* OTAs are the traveling public's link to this indispensable network.

Pegasus maintains a collection of electronically bookable hotels and a distribution network that consists of many of the top travel websites and providers, which collectively use the key website accessed directly by consumers also to include the tens of thousands of affiliate websites and partners. *Id.* ¶ 12. Additionally, Pegasus hosts this content for over 600,000 travel agents worldwide.

-1-

1   A GDS is an electronic reservation network that acts as a single point of access for
2   online travel bookings by travel agents, booking sites, and large corporations.  *Id.*
3   The four GDSs used by such travel agents, booking sites, and large corporations are
4   Amadeus, Galileo, Sabre, and Worldspan.  *Id.* ¶¶ 10-11.  Any hotels that want to
5   advertise or distribute visual and rich content through an OTA must use the GDSs or
6   Pegasus, which are the essential intermediaries for the distribution of hotel content
7   to OTAs.  *Id.* ¶¶ 10, 48, 70.

8       PSP and VFML compete in the relevant markets for management and
9   distribution of digital photographs and rich media content for online hotel listings.
10  *Id.* ¶¶ 19-24.  Within the last few years, PSP has developed and provided a highly
11  efficient and cost-effective competing platform for collecting, processing,
12  managing, and distributing visual content and rich media for online hotel listings
13  distribution that was and is superior to what VFML provides.  *Id.*

14      VFML has executed a multifaceted anticompetitive scheme to exclude
15  competitors from and to monopolize these lucrative markets.  To thwart
16  competition, in 2008, VFML first acquired its major competitor Leonardo Media,
17  B.V., a Dutch corporation (*id.* at ¶¶45-47); it then entered into a network of *de facto*
18  exclusive dealing and tying arrangements with: (a) Pegasus, the sole content and
19  information aggregator in the travel industry; (b) all four of the GDSs for visual
20  content and rich media for online hotel listings distribution: Sabre Holdings Group
21  (owner of Sabre/Travelocity), Travelport Limited (owner of Worldspan and
22  Galileo), and Amadeus; and (c) the major hotel groups.  *Id.* ¶¶ 43-44, 48-59, 81-85.

23      Under the arrangements with Pegasus and the GDSs, VFML provided free
24  access to VFML-controlled hotel content, continued distribution of that content, and
25  its Digital Asset Management technology platform, *in exchange for* the exclusive
26  rights to distribute hotel content for those GDSs and Pegasus and their affiliated
27  hotel clients and OTAs.  *Id.* ¶ 48-49.  VFML has, in effect, *tied* critical access to its
28  massive collection and distribution of hotel content and its technology platform (the

Blecher Collins
Pepperman & Joye

1   tying products), to its *exclusive* right to distribute hotel content for these GDSs and

2   their affiliated network of OTAs and hotel clients (the tied product).  *Id.* ¶¶ 48-49,

3   81-85.  These tying-exclusive arrangements are practically perpetual because the

4   costs to the GDSs (and their OTAs) of moving their technology platform and

5   content-distribution from VFML to another provider are prohibitive and switching is

6   not a real option; and the GDSs and OTAs have confirmed they are precluded from

7   dealing with competing distributors, such as PSP, due to their arrangements with

8   VFML.  *Id.* ¶¶ 69-72; *see also* Dkt. 55 at 8 (Court's order referencing relevance of

9   "switching costs").  As a result of these arrangements, VFML has been able to

10  exclude rivals, including PSP, from access to partners and outlets that are essential

11  to the provision of services in the relevant Photo Distribution Market and Rich

12  Content Distribution Market; any hotels that want to advertise or distribute visual

13  and rich content through an OTA must use an intermediary such as the GDSs or

14  Pegasus, they must, by virtue of this network of exclusive dealing arrangements, use

15  VFML instead of another competitor.  *Id.* ¶¶ 10, 48, 70.  Further, since 2008, VFML

16  has used and continues to use its monopoly power in the Photo Distribution Market

17  and the Rich Content Distribution Market to secure exclusive dealing arrangements,

18  by means of illegal tying, with major hotel groups and OTAs, thereby foreclosing

19  competition in the Rich Content Distribution Market.  *Id.* ¶¶ 77-80.

20         As a result of this network of exclusive dealing-tying arrangements, VFML

21  dominates the relevant markets for management and distribution of digital

22  photographs and rich media content for online hotel listings distribution, possessing

23  a market share of 80%.  *Id.* ¶¶ 1-2, 97-109.  VFML has become the sole distributor

24  of hotel photos and rich media content to Pegasus and all four major GDSs, their

25  affiliated OTAs, and major hotel groups.  *Id.* ¶¶ 97-105.  PSP, VFML's only real

26  remaining competitor, is substantially foreclosed from the relevant market because it

27  cannot access essential intermediaries, the GDSs, and their affiliated OTAs and

28  hotel groups, and competition in the relevant markets has been suppressed and

Blecher Collins
Pepperman & Joye

1    virtually eliminated, harming consumers. *Id.* ¶¶ 106-109.

2                    **ARGUMENT**

3    **I.**     **Legal Standard**

4        Motions to dismiss brought under Fed. R. Civ. P. 12(b)(6) are generally

5    disfavored and are to be granted in only extreme circumstances. *See, e.g.*, *Gilligan*

6    *v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). In ruling on a motion to

7    dismiss, the court must accept as true all factual allegations in the complaint and

8    must draw all reasonable inferences, construing the complaint liberally, in the light

9    most favorable to the plaintiff. *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995,

10   1003 (9th Cir. 2013). Fed. R. Civ. P. 8(a)(2) does not require a specific quantity of

11   facts but simply "'a short and plain statement of the claim showing that the pleader

12   is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation

13   omitted). "Specific facts are not necessary," and a complaint need only give the

14   defendant fair notice of the claims and grounds upon which they rest. *Erickson v.*

15   *Pardus*, 551 U.S. 89, 93 (2007); *Twombly*, 550 U.S. at 555 (noting "detailed factual

16   allegations" are not required). A plaintiff must simply plead "enough facts to state a

17   claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

18   **II.**    **PSP Has Sufficiently Pled Sherman Act Claims**

19        The antitrust laws seek "to promote and protect a competitive marketplace for

20   the benefit of the public." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d

21   1195, 1214 (9th Cir. 1997). Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits

22   the "acquisition or maintenance of a monopoly by exclusionary conduct." *Id.* A

23   monopolization claim under Section 2 has three elements: "(1) the defendant

24   possesses monopoly power in the relevant market[s]; (2) the defendant has willfully

25   acquired or maintained that power; and (3) the defendant's conduct has caused

26   antitrust injury." *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937,

27   949 (9th Cir. 1996). VFML asserts PSP has failed to plead the first and third

28   elements; VFML does not contend PSP has failed to allege VFML's monopoly

Blecher Collins
Pepperman & Joye

-4-

power in the relevant markets for Technology Platform (70% share), Photo Distribution (90 % share), and Rich Content Distribution (80% share).  SAC ¶¶ 31-32, 35, 39.   PSP has sufficiently pled monopolization under Section 2 of the Sherman Act and unlawful arrangements that unreasonably restrain trade in violation of Section 1 of the Sherman Act.

### A. PSP Has Sufficiently Pled Unlawful Monopoly Maintenance Through Exclusionary Conduct Eliminating Competition

#### 1. Monopoly-Maintenance Standard

A violation of Section 2 for unlawful monopoly maintenance consists of two elements: (1) possession of monopoly power (which VFML does not contest) and (2) "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 480 (1992).  Section 2 prohibits a monopolist from conduct seeking "to foreclose competition, to gain a competitive advantage, or to destroy a competitor" (*id*. at 482-83), or "'attempting to exclude rivals on some basis other than efficiency.'"  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (citation omitted).  It is unlawful for a monopolist to engage in "'conduct which unnecessarily excludes or handicaps competitors'" in order to maintain a monopoly.  *Id*. at 597 (citation omitted). Whether conduct is anticompetitive is a ***factual question*** for the jury.  *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1255 (9th Cir. 1990).

VFML's motion hinges on the misplaced assumption that the alleged anticompetitive (or exclusionary) conduct – here the network of *de facto* exclusive dealing arrangements – must independently constitute unlawful exclusive dealing (violating Section 1 of the Sherman Act) in order for that conduct to give rise to unlawful monopoly maintenance under Section 2.  "Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *Dentsply*, 399 F.3d at 187.  "'[A] monopolist is not free to take certain

-5-

actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior.'" *Id.* (quoting *LePage's, Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003)).  So, "practices that harm rivals unnecessarily may be violations of §2 when committed by a dominant firm, even though they would not be violations of other provisions when no dominant firm is involved."  3 Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651i, at 128 (3d ed. 2008).  For example, a monopolist's exclusive dealing arrangements may not violate § 1, but can still run afoul of § 2.  11 *id.* ¶ 1800, at 21-22 (3d ed. 2011) ("The court [in *Microsoft*] rejected Microsoft's contention that a finding of no liability under §1 'necessarily precludes holding it liable under § 2.'" (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001))).

"The point is that §2's highly general proscription of 'monopolistic' practices is not cabined by any specific statutory formulation and thus can be both less than or more than the prohibitions of the other antitrust laws," which "gives the courts more flexibility to fashion legal doctrine respecting dominant firms."  3 *id.* ¶ 651i, at 128-29.  Therefore, "a finding in favor of the defendant [on an exclusive dealing claim] under Section 1 of the Sherman Act . . . [does] not 'preclude the application of evidence of exclusive dealing to support the [Section 2 claim.'"  *Dentsply*, 399 F.3d at 197 (quoting *LePage's*, 324 F.3d at 157 n.3); *accord Tele Atlas N.V. v. Navteq Corp.*, No. 05-01673, 2008 WL 4911230, *1 (N.D. Cal. Nov. 13, 2008) ("[E]xclusive dealing arrangements that may not violate [§] 1 of the Sherman Act can still run afoul of [§] 2.").

Further, in considering § 2 violations, it is "improper 'to focus on specific individual acts of an accused monopolist while refusing to consider the overall combined effect.'"  *Masimo Corp. v. Tyco Health Care Group, L.P.*, No. 02-4770, 2004 WL 5907538, *5 (C.D. Cal. June 10, 2004) (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1378 (9th Cir. 1992)).  "[C]ourts must consider all of an alleged monopolist's related conduct in the aggregate" and "[w]hat matters is

-6-

1  whether the 'synergistic effect' of the alleged conduct is to harm competition, and

2  thus perpetuate a monopoly." *Tele Atlas*, 2008 WL 4911230 at *1-2; *id.* at *1

3  ("anticompetitive conduct" in maintenance of monopoly, "may include otherwise

4  *legal* conduct," which is a "point [that] is clear from this past century's

5  jurisprudence").

6        Therefore, "[a]lthough not illegal in themselves, exclusive dealing

7  arrangements can be an improper means of maintaining a monopoly." *Dentsply*,

8  399 F.3d at 187 (citing *U.S. v. Grinnell Corp.*, 384 U.S. 563 (1966)); *LePage's*, 324

9  F.3d at 157.  "A prerequisite for such a violation is a finding that monopoly power

10  exists."  *Dentsply*, 399 F.3d at 187.  "In addition, the exclusionary conduct must

11  have an anti-competitive effect."  *Id.*  "Unlawful maintenance of a monopoly is

12  demonstrated by proof that a defendant has engaged in anti-competitive conduct that

13  reasonably appears to be a significant contribution to maintaining monopoly

14  power."  *Id.* (citing *Microsoft*, 253 F.3d at 79).  "[A]s a general matter the exclusion

15  of nascent threats is the type of conduct that is reasonably capable of contributing

16  significantly to a defendant's continued monopoly."  *Microsoft*, 253 F.3d at 79.

17  "[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free

18  reign to squash nascent, albeit unproven, competitors at will. . . ."  *Id.*  In *Microsoft*,

19  as here, the arrangements with purchasers had "significant effect in preserving its

20  monopoly" by "keep[ing] usage of [rival's product] below the critical level

21  necessary to pose a real threat to [defendant's] monopoly."  *Id.* at 71.

22        **2.**     **VFML's Monopoly-Maintenance Conduct**

23        A monopolist violates Section 2 by entering into exclusive dealing

24  arrangements, whether express or *de facto*, that unreasonably foreclose a substantial

25  portion of the relevant market to existing or potential competitors. *Tampa Elec. Co.*

26  *v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Dentsply*, 399 F.3d at 191 (finding

27  foreclosure in § 2 case when exclusionary practices "ensure[d] that the key dealers

28  offer [supplier's product] either as the only or dominant choice"; "it is not necessary

Blecher Collins
Pepperman & Joye

-7-

that all competition be removed from the market"). "Exclusive dealing arrangements are of special concern when imposed by a monopolist." *ZF Meritor*, 696 F.3d at 271. Whether an arrangement between parties is a *de facto* exclusive dealing arrangement is a *question of fact. Masimo*, 2004 WL 5907538 at *16. Further, "[t]he question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage." *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 WL 812143, *19 (D.N.J. Mar. 5, 2013).

Exclusionary dealing arrangements need not, as VFML suggests, expressly prescribe exclusivity to be deemed unlawful under the antitrust laws. Exclusionary contracts can be found illegal "even though [the] contract does 'not contain specific agreements not to use the (goods) of a competitor,' if 'the practical effect . . . is to prevent such use.'" *Tampa Elec.*, 365 U.S. at 326-27. "An express exclusivity requirement . . . is not necessary because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.' Thus, *de facto* exclusive dealing claims are cognizable under the antitrust laws." *ZF Meritor*, 696 F.3d at 270 (citations omitted). Whether a contract creates an exclusive dealing arrangement depends on the contract's "practical effect" and its "practical application." *Tampa Elec.*, 365 U.S. at 327.

### a. VFML's Exclusive Dealing Contracts are Neither of Short Duration, Nor Easily Terminable, But Are *De Facto* Perpetual Exclusive Dealing Arrangements Foreclosing Competition That Have Never Been Terminated

VFML's motion to dismiss PSP's monopolization claims rests, and falls, on its flawed cabining of PSP's exclusive dealing allegations into the narrow confines of VFML's own self-serving conclusions about the meaning and effect of submitted written contracts with the GDSs-Pegasus and the OTAs and hotels, of which it requests judicial notice. It argues that those agreements, by their terms: (a) are of short duration and permit termination on short notice, (b) do not all expressly confer

-8-

complete exclusivity in distribution of all content, and hence (c) do not foreclose competition.[1]  This is the pleadings stage of an antitrust case, not the merits stage of a breach of written contract case where the unambiguous terms of the contract takes precedence.  VFML cannot invoke the terms of those agreements to excise PSP's allegations of the *de facto* exclusive nature, and the practical exclusionary effect, of its network of arrangements.  Specifically, as set forth in the SAC: (a) the VFML agreements conferring exclusivity are not of short duration, nor terminable on short notice (SAC ¶¶ 50-64); (b) VFML's arrangements confer *de facto* perpetual exclusivity because switching costs are prohibitive and dealing with VFML is an economic necessity (SAC ¶¶ 69-76); and (c) competition has been substantially foreclosed – indeed eliminated.  SAC ¶¶ 43-44, 97-109.

(1) The Pegasus contract, entered June 2009,  provides that Pegasus will accept distribution of digital photographs and rich media exclusively from VFML, is for **five years** and still in effect and subject to renewal, and can be terminated only upon 12 months' notice (SAC ¶¶ 51-52); given Pegasus's critical significance to the online travel industry – with its vast network of OTA-related channels and hotel groups – this lengthy arrangement conferring complete exclusivity over all content distribution, would, standing alone, foreclose a substantial share of the market. *Id.*

(2) The Amadeus contract, entered into August 2009, provides that it will accept distribution of rich media exclusively from VFML, has a **three-year** initial

_____

[1] VFML has emphasized provisions in a few of the contracts that carve out an exception to VFML's exclusivity to allow direct sourcing of photographs.  But even accepting VFML's assertion that the exclusivity terms applied only to rich media distribution and not to photograph distribution (over which VFML already held a monopoly), the agreements indisputably foreclosed competition in most all of the relevant market for rich media distribution.  In any event, where there is a dominant supplier, "the lack of complete exclusivity in each contract does not preclude [a] *de facto* exclusive dealing claim." *ZF Meritor*, 696 F.3d at 284.

Blecher Collins Pepperman & Joye

1  term that has already been extended once, and is still capable of further extension.

2  *Id.* ¶¶ 53-54.

3      (3) The Sabre-Travelocity contract, entered into in October 2007, provides

4  that it will accept all distribution of rich media exclusively from VFML, is for

5  **three-year** initial term, and terminable only on paying a fee equal to the annual fee.

6  *Id.* ¶¶ 55-56.

7      (4) The Travelport (Galileo-Worldspan), entered October 2007, provides it

8  agreed to accept distribution of all rich media exclusively from VFML, and for

9  Galileo the initial term is for **two years**, has been extended for **three years,** and for

10  Worldspan **two years**, and termination on 90-days' notice.  *Id.* ¶¶ 57-59.

11      VFML's exclusive dealing arrangements are factually distinguishable from

12  cases upholding short-term, easily terminable exclusive dealing contracts.  Here, the

13  Pegasus contract was for five years and terminable on 12 months' notice.

14  Termination of the Sabre agreement provides for a substantial monetary penalty.

15  All of the contracts are of a duration of two years and greater, are continually

16  renewed and not open to rebidding, cover the entire United States, and collectively

17  are industry-wide so as to foreclose – rather than promote – any competition.  These

18  anticompetitive exclusive dealing and tying arrangements are factually

19  distinguishable from the contracts at issue in *Paddock Publ'ns, Inc. v. Chicago

20  Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), *NicSand, Inc. v. 3M Co.*, 507 F.3d 442

21  (6th Cir. 2007), *SPX Corp. v. Mastercool U.S.A., Inc.*, No. 10-1266, 2011 WL

22  2532889 (N.D. Ohio June 24, 2011), *W. Parcel Express v. United Parcel Serv.*, 65

23  F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999), and *Omega

24  Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997).

25      *Paddock* involved distribution of newspapers in a single city (as opposed to

26  the markets here covering the entire United States).  The court emphasized that the

27  contracts were open to frequent rebidding, which helps decrease prices and benefits

28  consumers.  *Paddock*, 103 F.3d at 45.  Here, there are no offers for bids or rebidding

Blecher Collins
Pepperman & Joye

-10-

1  in this industry, and VFML is exerting monopoly power to steadily increase, not

2  lower, prices and to require mandatory upgrades to utilize its services.  PSP and

3  former competitor ICE Portal have never been asked to bid by the GDSs or Pegasus.

4  PSP has unsuccessfully tried numerous times to reach out and make offers but the

5  GDSs and Pegasus have confirmed they cannot deal with other distributors and are

6  precluded from doing so by their arrangements with VFML.  SAC ¶¶ 61, 72.

7  VFML's exclusionary conduct is hindering – not encouraging – competition and has

8  certainly not "enhance[d] . . . interbrand competition."  *Omega*, 127 F.3d at 1162.

9  Here, the exclusive dealing arrangements "'foreclose competition in a substantial

10  share of the line of commerce affected.'"  *Allied Orthopedic Appliances Inc. v. Tyco*

11  *Health Care Group LP*, 592 F.3d 991, 996 (9th Cir. 2010) (citation omitted).

12      *NicSand* involved the offer of lower prices for extended exclusivity to recoup

13  costs.  *NicSand*, 507 F.3d at 453.  VFML never reduced its fees – only increased

14  them.  Likewise, it forces users to upgrade to its newest system at a higher cost and

15  also includes a new mandatory extended contract with the hotel owners.

16      *SPX* involved a one-year contract with a 30-day notice termination provision.

17  *SPX*, 2011 WL 2532889 at *1.  VFML's contracts range from *two to five times*

18  longer.  Moreover, only the Amadeus contract provides as short as a 30-day

19  termination provision; the Pegasus notice period is 12 times as long, the notice

20  period in the Galileo and Worldspan contracts is three times in length, and the Sabre

21  contract's monetary penalty acts a deterrent for early termination.

22      *Western Parcel* granted summary judgment on an exclusive dealing claim

23  "based on uncontradicted evidence in the record" establishing that the contracts: (a)

24  were terminable "for 'virtually any reason at any time'"; (b) were not even exclusive

25  dealing contracts, but rather were volume discount contracts; and (c) had lawful

26  procompetitive effects in a highly competitive expanding market with no entry

27  barriers and in which competitors "aggressively entered" and in which plaintiff had

28  "seen significant increase in profits."  190 F.3d at 975-77.

Blecher Collins
Pepperman & Joye

-11-

1       In *Omega*, an undisputed and complete evidentiary record showed: (a) the

2   agreements foreclosed 38% (less than half the foreclosure share alleged here); (b)

3   there were hundreds of distributors available to manufacturers; (c) there were four

4   other competing manufacturers that had significant "sales to end-users as an

5   alternative channel of distribution"; (d) all of the distributor contracts were for one

6   year only and were easily terminable; (e) there was actual entry and expansion of a

7   competing manufacturer, while "industry output . . . expanded substantially"; and (f)

8   the plaintiff had direct access to the end user retail market.  127 F.3d at 1162-65.

9       Finally, none of these cases involved allegations of *de facto* perpetual

10  exclusive dealing of the type involved here (and discussed below).

11      VFML's submitted hotel contracts and OTA contracts also do not qualify as

12  short-term, easily terminable contracts.  First, setting aside allegations of the *de*

13  *facto* exclusive and perpetual nature of these arrangements (addressed below), most

14  of the contracts with the hotel groups are for initial two-year terms but have been, or

15  are being, extended to a duration of four to five years from their inception.

16  Moreover, none have been terminated, they have early cancellation penalties, and

17  they offer substantial discounts conditioned on endorsing VFML as  the "exclusive"

18  provider of the distribution of moving-media.[2]   Similarly, the OTA contracts are

19  almost all for a term of two years or three years, have been extended and/or still in

20  effect, and condition discounts on VFML's being the "exclusive" provider of

21  moving media and/or images.[3]

22

23  _____

[2] These contracts, included in the Declaration of David Han, Dkt. 65 ("Han Decl."),

24  are: **Hilton** (Ex. I at 68, 96); **Marriott** (Ex. L at 40, 49); **Best Western** (Ex. K at 39,

    49); **Wyndham** (Ex. M at 6, 18, 31); **IHG** (Ex. O at 30, 40); **La Quinta** (Ex. N. at

25  1, 5, 20); and **Vantage** (Ex. G, at 1, 19).

26  [3] These contracts, at Han Decl., are: **Orbitz** (Ex. U, at 16-17); **Expedia** (Ex. S, at 5,

27  20); **Travelocity** (Ex. V, at 24-25, 28); **TripAdvisor** (Ex. P, at 1,  9, 11); **Kayak**

28  (Ex. T, at 1, 11, 15); **Bookings.com** (Ex. R, at 1, 9); **Priceline** (Ex. Q, at 1- 3).

Blecher Collins
Pepperman & Joye

Although VFML glides over the significance of terms conferring discounts in exchange for (on the condition of) exclusivity, these terms are treated the same as exclusive dealing arrangements. *Masimo*, 350 Fed. Appx. at 97 ("[C]onditioning [a] discount on the requirement of near complete exclusivity . . . is the hallmark of exclusive dealing."); *accord* 11 Areeda & Hovenkamp, *supra*, ¶ 1807b, at 133 (discounts conditioned on exclusivity should generally be treated the same as an "orthodox" exclusive dealing arrangement). Courts have held that discounts offered by a monopolist to major suppliers "were designed to and did operate as exclusive dealing arrangements, despite the lack of any express exclusivity requirements." *ZF Meritor*, 696 F.3d at 282 (citing *LePage's*, 324 F.3d at 157-58). Even where the discount agreements are "terminable on short notice on their face," they may not be terminable "in practice" and be "de facto exclusive," particularly where, as here, the customers are "locked into" purchases from the monopolist and deprived of an opportunity to switch to a competitor. *Masimo Corp. v. Tyco Health Care Group, L.P.*, No. 02-7440, 2006 WL 1236666, *6 (C.D. Cal. Mar. 22, 2006); *id.* at *7 (noting "[t]he relevant inquiry is whether the [purchasers] could get out of the agreements on short notice" and the contracts, unlike those in *Omega*, "were not in practice terminable on short notice").

In sum, justiciable factual issues exist as to whether a network of industry-wide exclusive agreements by a monopolist of multi-year duration with lengthy notice periods for termination that are coupled with discounts for exclusivity, could properly be described as "short-term" contracts that are "readily" and "quickly" terminable on "short notice" as a matter of law.

> **b.  *De Facto* Exclusivity Exists Because Dealing with VFML Is an Economic Necessity and Switching Costs Are Prohibitive**

While purportedly executed for fixed terms with termination rights, VFML's tying and exclusive arrangements are, in fact, practically perpetual where the costs to the GDSs-Pegasus (and their affiliated OTAs) of moving their technology

Blecher Collins Pepperman & Joye

1   platform and content from VFML to another provider are prohibitive and switching

2   is, therefore, not a real option.  SAC ¶ 69.  The costs of switching from VFML to

3   another distributor, such as PSP, are prohibitive because the VFML-controlled

4   installed base of critically needed content and platform for distribution would have

5   to be completely replaced and replicated.  *Id.*  Switching would take too long

6   (years), cost too much (millions of dollars), and be too risky even to attempt by

7   placing the switching GDS (and its affiliated OTAs) at a grave competitive

8   disadvantage in relation to other competitors that remained in the exclusive

9   arrangements with VFML.  *Id.*

10          The GDSs (and their OTAs) must use VFML because it controls the dominant

11   share of hotel content, is the monopoly provider of photo distribution, and provides

12   the technology platform necessary for the GDSs (and the OTAs that use them) to

13   operate competitively.  *Id.* ¶ 72.  VFML's exclusive arrangements with the GDSs

14   (and their OTAs) have essentially *tied* the critically necessary access to VFML-

15   controlled hotel content and distribution platform to VFML's exclusive distribution

16   of hotel content.  If a GDS terminated its exclusive arrangements with VFML – and,

17   as a sure consequence of that, lost access to VFML-controlled hotel content and

18   distribution platform – it would face prohibitively high "switching costs" in trying to

19   replace or replicate the lost VFML content and distribution platform, putting it at a

20   significant competitive disadvantage *vis-à-vis* other GDSs that still had access to the

21   VFML-controlled content and distribution platform.  *Id.*  No single GDS would or

22   could terminate its exclusive arrangements with VFML (and try to multi-source)

23   because VFML would cut them off from access to the necessary VFML-controlled

24   content and the distribution platform, seriously disabling if not destroying that

25   GDS's competitive presence.  *Id.*

26          Similarly, the hotels want but are precluded from the benefits of choice

27   among alternative channels of distribution for their hotel content because they

28   cannot afford to lose access to the VFML-controlled distribution platform

Blecher Collins
Pepperman & Joye

1   exclusively used by the GDSs (and their OTAs), which would be the consequence of

2   terminating their exclusive arrangements with VFML.  *Id.* ¶ 70.  The hotels are

3   forced into dealing exclusively with VFML because, in order to have their content

4   displayed through the GDSs (and, in turn, reach their network of OTA affiliates

5   representing the vast bulk of online travel channels of distribution), they *must use*

6   VFML's monopoly distribution platform, the only one used by the GDSs and their

7   OTAs; as a practical matter, each and every hotel that distributes content to more

8   than one OTA must go through VFML.  *Id.* ¶ 71.

9         Accordingly, VFML is assured *de facto* exclusivity and market dominance

10   whether or not required by contracts and despite terms of duration and terminability.

11   The impracticability of terminating the exclusive dealing arrangements renders any

12   written term allowing for termination on short notice "meaningless."  SAC ¶ 76

13   (quoting *ZF Meritor*, 696 F.3d at 287).  Under the circumstances here, reliance on

14   written terms ostensibly allowing for termination would: (a) impermissibly

15   contradict the realities of impracticability of termination, and (b) essentially confer

16   complete antitrust immunity for *de facto* exclusive dealing by the sheer *fiat* of the

17   existence of such terms in the written contracts (thereby encouraging monopolists to

18   insert such provisions to shield their monopoly-maintenance conduct from antitrust

19   scrutiny).

20         PSP's SAC expressly alleges that GDSs, major OTAs, and hotel groups have

21   confirmed that they *cannot* deal with any competing distributors (e.g., PSP) because

22   they cannot afford the inexorable consequence of losing access to VFML's content

23   and distribution platform.  SAC ¶ 72.  In response to these allegations of

24   impracticability of terminating and switching from VFML, VFML asserts that PSP

25   is attempting to "penalize" it for having "superior" and "preferred" products.  Dkt.

26   64 at 12-14.  But this argument ignores PSP's allegations of its superior products

27   and services that were desired by, but deprived from, purchasers that wanted, but

28   denied, choice (through multi-sourcing) as a result of VFML's "all or nothing" basis

Blecher Collins
Pepperman & Joye

1    for doing business.  SAC ¶¶ 19-24, 72.  Because PSP's allegations must be accepted

2    as true, VFML's argument concerning the superiority of its products is premature.

3        As a result of its *de facto* exclusionary dealing, monopolist VFML has

4    foreclosed nascent competitors from the relevant markets, allowing it to maintain

5    and perpetuate enduring monopolies and become, as VFML boasts, "the visual

6    content switch" for the online travel industry.  *Id.* ¶¶ 97-105.  As previously

7    discussed, the Sherman Act does not countenance such conduct directed at a nascent

8    competitor.  *Supra* at 7.[4]

9            c.    **VFML's *De Facto* Exclusive Dealings Foreclose
                  Competition and Constitute Unlawful Monopoly
10                Maintenance**

11       Where the defendant has a dominant market share, as here, a *de facto*

12   exclusive dealing monopolization claim may still be stated even where the written

13   agreements provide that they are of short duration and easily terminable on short

14   notice.  *Dentsply*, 399 F.3d at 193-94; *ZF Meritor*, 696 F.3d at 282-83, 287.  In such

15   circumstances, courts require realistic assessment of the market (not just contract

16   terms) to determine whether the contractual right to terminate has any real-world

17   commercial significance.  Courts must "look past the terms of the contract to

18   ascertain the relationship between the parties and the effect of the agreement 'in the

19   real world.'"  *ZF Meritor*, 696 F.3d at 270 (citation omitted).  "The Supreme Court

20   on more than one occasion has emphasized that economic realities rather than a

21   formalistic approach must govern review of antitrust activity."  *Dentsply*, 399 F.3d

22   at 189.

23       Long-established Supreme Court precedent endorses monopoly-maintenance

24   liability for *de facto* exclusive dealing arrangements, despite terms ostensibly

25   _____

26   [4] Even a flawed technology may provide competitive benefits: "the inquiry [into
     whether a given patent is superior or inferior] is rarely worthwhile, for even inferior
27   technologies can provide some, if not perfect, competition to the patentee."  3
     Areeda & Hovenkamp, *supra*, ¶ 707e, at 287.
28

Blecher Collins
Pepperman & Joye

1  allowing for short duration or termination on short notice, where switching is

2  impracticable due to the indispensability and market dominance of the monopolist.

3  As was discussed in *Tampa Elec.*, 365 U.S. at 327 (emphasis added):

4     *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 457
       (1922) . . . held that even though a contract does 'not contain specific
5     agreements not to use the (goods) of a competitor,' if 'the practical
       effect . . . is to prevent such use,' it comes within the condition of the
6     section as to exclusivity. The Court also held, as it had in [*Standard
       Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346 (1922)], that **a finding
7     of domination of the relevant market by the lessor or seller was
       sufficient** to support the inference that competition had or would be
8     substantially lessened by the contracts involved there.  As of that time it
       seemed clear that if 'the practical effect' of the contract was to prevent
9     a lessee or buyer from using the products of a competitor of the lessor
       or seller and the contract would thereby probably substantially lessen
10    competition in a line of commerce, it was proscribed.

11    In *United Shoe*, the restrictive exclusive-dealing lease provisions were of

12  short duration in the sense that USM had the right to cancel the leases if the lessee

13  used the equipment of another shoe-machinery maker; yet despite that, the practical

14  market realities made it apparent that they "tend[ed] to monopoly":

15    When it is considered that the United Company occupies a dominating
       position in supplying shoe machinery of the classes involved, these
16    covenants, signed by the lessee and binding upon him, effectually
       prevent him from acquiring the machinery of a competitor of the lessor,
17    except at the risk of forfeiting the right to use the machines furnished
       by the United Company, **which may be absolutely essential to the
18    prosecution and success of his business**.

19  *United Shoe*, 258 U.S. at 457-58 (emphasis added).  The lease restrictions were

20  therefore "quite as effective as express covenants could be, and practically compels

21  the use of the machinery of the lessor, except upon risks which manufacturers will

22  not willingly incur." *Id.* at 458.  As explained by the leading antitrust treatise:

23    Although the [*United Shoe*] Court did not say so explicitly, it
       apparently realized that short duration alone does not alleviate
24    competitive concerns when the firm made subject to exclusive dealing
       has a significant investment in existing equipment and methods.
25    **Theoretically, the lessee could have dropped USM's machines and
       used the machines of rivals on very short notice; as a practical
26    matter, dropping USM's machines would undoubtedly have entailed
       significant expense**.

27

28

-17-

1   11 Areeda & Hovenkamp, *supra*, ¶ 1801c, at 39 (emphasis added).  Hence, in a

2   situation of "de facto duration," the "[d]urational requirements need not be explicit

3   in the contract.  More significantly, a short notice period may suggest unrealistically

4   that terminating a contract is less costly than it is in fact."  *Id.* ¶ 1802g3, at 101.

5        In *Dentsply,* "[a]lthough the parties to the sales transactions consider the

6   exclusionary arrangements to be agreements, they are technically only a series of

7   independent sales.  Dentsply sells teeth to the dealers on an individual transaction

8   basis and essentially the arrangement is 'at-will.'" 399 F.3d at 193. "Nevertheless,

9   the economic elements involved – the large share of the market held by Dentsply

10  and its conduct excluding competing manufacturers – realistically make the

11  arrangements here as effective as those in written contracts."  *Id.* (citation omitted).

12  Hence, "in this case, in spite of the legal ease with which the relationship can be

13  terminated, the dealers have a strong economic incentive to continue carrying

14  Dentsply's teeth."  *Id.* at 194.  The Court "distinguish[ed]" other cases, including

15  those relied on by VFML here, where "courts have indicated that exclusive dealing

16  contracts of short duration are not violations of the antitrust laws."  *Id.* at 194 n.2.

17        *Dentsply* was followed in *ZF Meritor*, 696 F.3d at 282-83, where the Court

18  sustained a "de facto partial exclusive dealing" claim involving written contracts

19  giving the defendant the right to terminate the agreements with OEMs (truck

20  manufacturers) if the market share targets were not met.  There, "despite the fact

21  that Eaton did not actually terminate the agreements on the rare occasion when an

22  OEM failed to meet its target, the OEMs believed that it might."  *Id.* "Critically, due

23  to Eaton's position as the dominant supplier, no OEM could satisfy customer

24  demand without at least some Eaton products, and therefore no OEM could afford to

25  lose Eaton as a supplier."  *Id.* at 283.  Accordingly, "under the circumstances, the

26  market penetration targets were as effective as express purchase requirements

27  'because no risk averse business would jeopardize its relationship with the largest

28  manufacturer of transmissions in the market.'" *Id.* (footnote and citation omitted).

Blecher Collins
Pepperman & Joye

-18-

1     In *ZF Meritor*, the agreements "permitted the OEM to purchase from another

2  supplier or terminate the agreement if another supplier offered a better product or a

3  lower price." *Id.* at 287.  Yet, "any language giving OEMs the right to terminate

4  was essentially meaningless because Eaton assured that there would be no other

5  supplier that could fulfill the OEMs' needs or offer a lower price." *Id.*  So "'in spite

6  of the legal ease with which the relationship c[ould] be terminated,' the OEMs had a

7  strong economic incentive to adhere to the terms of the [agreements], and therefore

8  were not free to walk away from the agreements and purchase products from the

9  supplier of their choice." *Id.* at 287 (quoting *Dentsply*, 399 F.3d at 194).[5]

10     *ZF Meritor* dismissed the argument, raised by VFML here, that there could be

11  no market foreclosure if a new competitor was free to compete with the monopolist

12  by "offering a superior product at a lower price," observing that, as is true here,

13  "'[t]he paltry penetration in the market over the years has been a refutation of' [the]

14  theory by tangible and measurable results in the real world.'" *Id.* (quoting *Dentsply*,

15  399 F.3d at 194).  It added: "Although we generally 'assume a customer will make

16  [its] decision only on the merits,' a monopolist may use its power to break the

17  competitive mechanism and deprive customers of the ability to make a meaningful

18  choice." *Id.* (citations omitted).  "A highly concentrated market, in which there is

19  one (or a few) dominant supplier(s), creates the possibility for such coercion." *Id.*

20  Here, that coercion is borne out by: (a) the GDSs-OTA and hotels confirming they

21  could not deal with PSP despite its superior product offerings (SAC ¶¶ 19-24, 72);

22  and (b) the lack of market penetration by rivals (*id.* ¶¶ 97-109).

23  _____

24  [5] *See also Masimo*, 2006 WL 1236666 at *3, 6 ("The Supreme Court has explained
    that a contract need not include specific terms of exclusivity in order to qualify as

25  exclusive dealing . . . as long as 'the practical effect' of the agreement is to exclude
    competitors"; and despite the monopolist's agreements "appear[ing] to have been

26  terminable on short notice on their face, the jury could have concluded that in

27  practice they were not" because the purchasers were "financially locked into

28  purchasing a fixed amount").

Blecher Collins
Pepperman & Joye

1    The Supreme Court's seminal exclusive dealing decision in *Standard Fashion*

2    held "that a finding of domination of the relevant market by the [] seller was

3    sufficient to support the inference that competition had or would be substantially

4    lessened by the [exclusive dealing] contracts involved." *Tampa Elec.*, 365 U.S. at

5    326.  Seventh Circuit Judge – and renowned antitrust scholar – Richard A. Posner

6    states that *"Standard Fashion* may have been a case that involved a unilateral action

7    that increased defendant's monopoly power."  Richard A. Posner, *Antitrust Law* 251

8    (2003).  In *Standard Fashion* "[t]he defendant manufactured a very popular line of

9    patterns that women could use to make their own dresses" and "[r]etailers thought it

10   essential to be able to sell the line." *Id.* at 251-52.  Because defendant required

11   retailers that carried it full line to agree not to carry competing lines, "[c]ompeting

12   manufacturers would have to create a line as long and as popular as Standard

13   Fashion's line, and that would be difficult, maybe impossible, to do."  *Id.* at 252.[6]

14   "Restricting its retailers no doubt cost Standard Fashion something, but maybe less

15   than the increase in its expected monopoly profits from forestalling new entry by

16   compelling prospective entrants to enter on a full-line basis." *Id.*[7]

17   A monopolist runs afoul of Section 2 by requiring customers to deal on an all-

18   or-nothing basis.  In *Dentsply*, the Third Circuit held that the monopolist defendant

19   that imposed an "all-or-nothing" choice on dealers "created a strong incentive for

20   dealers to reject competing lines" because "rivals simply could not provide dealers

21   with a comparable economic incentive to switch." 399 F.3d at 195; *accord ZF*

22   *Meritor*, 696 F.3d at 283 (holding that purchasers could not operate with the

---

[6] "Consumer's didn't want to traipse from store to store.  They wanted a full line in each store, so anyone entering the dress-pattern business had to provide the full line." *Id.*

[7] *Accord* 11 Areeda & Hovenkamp, *supra*, ¶ 1802e3, at 92 (agreeing with reasoning underlying *Standard Fashion* and condemning a dominant manufacturer's demand that only its products be purchased on an "all or nothing" basis even though stores may prefer to sell other manufacturers' products).

Blecher Collins
Pepperman & Joye

1    defendant's product and could not "afford to lose [the defendant] as a supplier").

2         Similarly, here the GDSs (and their OTA affiliates that got their content

3    solely through the GDSs) could not afford to lose access to VFML's line of

4    products/services – *i.e.,* VFML monopoly controlled content, distribution of that

5    content, and technology platform – that could not be replicated if they terminated

6    the exclusives and tried to switch out.  And so, even though they – similar to the

7    downstream purchasers in *Standard Fashion*, *United Shoe*, *Dentsply*, *ZF Meritor*,

8    and *Masimo* – wanted to multi-source (giving them more content and distribution

9    capabilities), they could not realistically do so even though they had a contractual

10   right to terminate their contracts.

11        VFML makes factual assertions, contrary to the SAC, that there could be no

12   foreclosure because the GDS-Pegasus agreements: (a) leave open there "alternative

13   channels of distribution to the OTAs"; and (b) do not all provide exclusivity over all

14   content distribution, and allow direct sourcing of images.  It does not attempt to

15   prove that the referenced terms of the agreements, in their "practical effect" and

16   "practical application," negated any possibility that the agreements will "foreclose

17   competition in a substantial share" of the relevant market.  *Tampa Elec.*, 365 U.S. at

18   327.  Moreover, as the *Ice Portal* court already held: "Given the vital role of the

19   GDSs and Pegasus in the relevant markets, it is *plausible* that [VFML]'s exclusive

20   contracts with 80% – and possibly 100% – of the essential intermediaries

21   substantially forecloses competition."  *ICE Portal Inc. v. VFM Leonardo, Inc.*, No.

22   09-61424, Dkt. 34, 12-13 (S.D. Fla. July 6, 2010).  Either way, VFML's arguments

23   are geared towards the factual merits and are not ripe for consideration on a Rule 12

24   motion.

25        In any event, the written agreements themselves cast serious doubt that

26   VFML ever will be able to support its contention that the GDSs and Pegasus can or

27   do source a substantial amount of hotel display images directly from hotels and

28   independently of VFML.  Indeed, all but one of those agreements confirm that

VFML is to become the "exclusive provider" of hotel "rich media," which is defined to include photos as well as rich content; and they state that "guiding intent" and "goal" or "key objective" is to make VFML the "single" provider or "*de facto* standard" of all hotel content.  SAC ¶¶ 65-68.

### B.   PSP Has Sufficiently Pled Tying Claims

The SAC alleges that two separate product markets have been linked.  Specifically, the SAC alleges that: "VFML obtained a monopoly in the ***Photo Distribution Market*** (90% share) and significant market power in the ***Technology Platform Market*** (approximately 70% share as of 2009).  It has used that monopoly power to gain a complete monopoly in ***the Rich Content Distribution Market*** through coerced, and perpetual, interrelated exclusive dealing and tying arrangements forced on the GDSs, their OTAs, and hotels."  SAC ¶ 47 (emphasis added), ¶¶ 146-148 (tying technology platform (a tying product) to rich content distribution (tied product)).  There are at least two tying product markets (technology platform and photo distribution) in which VFML had monopoly power that are distinct from at least one tied product (rich content distribution).  That the tying products also included (as coercive leverage) VFML's distribution of photo and rich content in order to force exclusive distribution of rich content (a tied product), does not undermine the existence of at least one tying product market (technology platform market) that is distinct from at least one tied product (rich content distribution).  PSP's tying allegations here are substantially similar to those previously found sufficient to state tying claims in *ICE Portal*, at 14-15.

### C.   PSP Has Sufficiently Pled Antitrust Injury

"[C]onduct that eliminates rivals reduces competition."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  Indeed, "elimination of a single competitor may violate [the Sherman Act] if it harms competition."  *E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1401 (9th Cir. 1989).  PSP has pled antitrust injury and harm to competition and consumers as a consequence of

1  VFML's anticompetitive conduct.  SAC ¶¶ 71-73, 97-109, 129.  VFML's assertions

2  that PSP did not try to compete and was not harmed by VFML's conduct flatly

3  contradicts the pled facts.  The SAC alleges: PSP developed a competing and

4  superior platform for management-distribution of hotel content, but was foreclosed

5  in its efforts to compete for business because of VFML's exclusionary

6  arrangements, which injured competition and consumers and caused PSP to suffer

7  financial injury, including loss of revenue and profits that it would otherwise have

8  made.  SAC ¶¶ 17-24, 48, 72-73, 97, 105, 129-32.

9      **D.      PSP Has Pled a Plausible Relevant Geographic Market**

10         VFML contends the relevant geographic market for purposes of this antitrust

11 case cannot be limited to the United States because it asserts VFML and the GDS

12 "operate internationally."  Dkt. 64 at 21.  It is well-settled law that geographic

13 market definition is an essential ***factual*** issue for the jury to decide.  *Newcal Indus.,*

14 *Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). "The relevant

15 market need not be pled with specificity."  *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F.

16 Supp. 2d 1119, 1135 (N.D. Cal. 2010).  Because of the fact-intensive inquiries

17 involved, dismissal on relevant market grounds is generally disfavored.  *Datel*

18 *Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010); *Todd*

19 *v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).  VFML's assertion that the

20 geographic market cannot, as a matter of law, be the United States -- because VFML

21 and GDSs purportedly have operations outside of the United States -- has been

22 squarely rejected.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d

23 435, 445 (4th Cir. 2011) ("No federal appellate court has held that supplier

24 headquarter sites must, as a matter of law, be included in the relevant geographic

25 market definition in Sherman Act cases" and "[w]hether [plaintiff's] proffered

26 relevant [U.S.] geographic market definition will hold up upon a fact-intensive

27 inquiry remains to be seen.").

28

Blecher Collins
Pepperman & Joye

-23-

**III.   This Court Has Already Ruled That Dismissal of PSP's Lanham Act Claim is Inappropriate at This Stage**

Despite this Court's previous denial of VFML's motion to dismiss PSP's "reverse passing off" Lanham Act claim (Dkt. 55 at 10-13), VFML has renewed its motion with respect to this claim.  *See* Local Rule 7-18 (governing motions for reconsideration).  Nevertheless, VFML proceeds to reargue that its previously-relied-on authorities (principally *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)), warrant dismissal. Dkt. 37 at 24-25; Dkt. 64 at 23-24.  This Court previously ruled PSP's Lanham Act allegations fell within the "exception" recognized in *Dastar* (Dkt. 55 at 12), but that it was "unclear" whether PSP could be characterized as the producer or publisher of the photographs as to which VFML was falsely attributed as the originator.  *Id* at 13.  To clear up that ambiguity, in the SAC, PSP amended its Lanham Act claim to state that the "misappropriated hotel photo images and rich media" was "produced" by PSP.  SAC ¶¶ 168, 169, 171.  PSP also attached copies to the SAC of examples of such hotel photo images to put VFML on further notice of the violation.  SAC, Exs. 5, 6.  Finally, VFML makes a disingenuous argument that the digital photos and rich media created and produced by PSP, and sold to hotels, are not "goods" protected by Lanham Act.  This contention flies in the face of the SAC's allegations, which unequivocally identify these material as "products" or "goods."  SAC ¶¶ 163, 166, 168, 172.

**IV.   PSP Has Sufficiently Pled Intentional Interference Claims**

VFML argues PSP's intentional interference claims concerning relationships with Best Western should be dismissed.  First, VFML's argument that PSP cannot satisfy the "independently wrongful" conduct element – because all of its antitrust claims should be dismissed at the pleading stage – is a classic bootstrap argument that should be rejected.  This element is met if the act is "unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.

Blecher Collins
Pepperman & Joye

-24-

1  4th 1134, 1159 (2003).  Because the well pled facts in the SAC allege violations of

2  antitrust law, it is premature for this Court to decide, absent a fully developed

3  evidentiary record, whether this element has been met.  Further, VFML concedes

4  that PSP's "claim rises and falls with its antitrust claims."  Dkt. 64 at 25.

5  **V.     PSP Withdraws Its Copyright Infringement Claim Without Prejudice**

6          Recently, PSP submitted copyright registration applications and payment to

7  the U.S. Copyright Office for the images depicted and encompassed in Exhibits 5-12

8  attached to the SAC.  *See Cosmetic Ideas v. IAC/Interactive Corp.*, 606 F.3d 612,

9  621 (9th Cir. 2010) ("[R]eceipt by the Copyright Office of a complete application

10 satisfies the registration requirement" that allows copyright holder right to institute

11 infringement action).  Due to the extended federal government shutdown, however,

12 it is unclear what the confirmation status of these applications is and whether they

13 have been processed and accepted.  Consequently, PSP withdraws, without

14 prejudice, its copyright claim herein, at least in the interim.

15                                **CONCLUSION**

16         VFML's motion should be denied.  If the Court finds that any of PSP's claims

17 are deficient in some manner, PSP requests leave of the Court to amend any such

18 allegations or claims.  The policy favoring amendment of complaints is to be applied

19 with "extreme liberality" and dismissals should occur only in extraordinary cases.

20 *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

21

22 Dated:  October 21, 2013          BLECHER COLLINS PEPPERMAN & JOYE, P.C.

23

24                          By:  _____/s/ Maxwell M. Blecher_____

25                                  MAXWELL M. BLECHER
                                Attorneys for Plaintiff Pro Search Plus, LLC
26 57668.6

27

28

-25-